IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

N.H., a Minor, By and Through    :        CIVIL ACTION
his Parents S.H. and L.H.        :
                                 :
    v.                           :
                                 :        NO. 21-1066
PHOENIXVILLE AREA SCHOOL         :
DISTRICT

MEMORANDUM

Bartle, J.                                December 20, 2021

        Plaintiffs N.H. by and through his parents S.H. and
L.H. brought this action against the Phoenixville Area School
District ("District") under the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and
Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  N.H. is
a student with a primary disability of Other Health Impairment
("OHI") and a secondary classification of Autism.  His parents
seek private school tuition reimbursement for the 2019-2020 and
2020-2021 school years.  They assert that the District in those
years failed to provide N.H. with a free appropriate public
education ("FAPE").  A special education hearing officer held a
hearing and issued a decision denying plaintiffs relief.  Before
the court are the cross-motions of the parties for judgment on
the administrative record.

                            I

        Under the IDEA, states receiving federal educational
funds must provide to children with disabilities between the

ages of three and twenty-one a FAPE.[1]  See 20 U.S.C.
§ 1412(a)(1)(A).  States, through local education agencies, must
identify, locate, and evaluate children who are in need of
special education and related services.  § 1412(a)(3)(A).  For
each child identified and in need of a FAPE, the agency must
develop an individualized education program ("IEP").
§ 1412(a)(4); § 1414(d).

An IEP is a comprehensive plan prepared by a team,
including the student's teachers and parents, in compliance with
a detailed set of procedures.  § 1414(d).  It identifies a
student's educational needs and present abilities, designs
services for addressing the student's needs, and sets goals for
measuring progress as well as a timeline for reaching those
goals.  Id.

The IDEA creates a cause of action against a school
district that does not meet its legal obligations.  A school
district may be liable for violating the procedural requirements
of the IDEA as well as for providing a substantively inadequate

---

1.   Section 504 of the Rehabilitation Act likewise obligates
recipients of federal funds to provide a free appropriate public
education.  See 34 C.F.R. § 104.33(a); D.K. v. Abington Sch.
Dist., 696 F.3d 233, 253 n.8 (3d Cir. 2012).  Plaintiffs' claims
under the IDEA and Section 504 of the Rehabilitation Act will be
considered together because in this context both acts impose on
the District the same duty.  D.K., 696 F.3d at 253 n.8.

IEP that deprives a student of a FAPE.  <u>C.H. v. Cape Henlopen Sch. Dist.</u>, 606 F.3d 59, 66 (3d Cir. 2010).

To be eligible for compensatory relief for an education agency's violating an IDEA procedural requirement, a plaintiff must show that the procedural violation caused the student "substantive harm."  <u>Id.</u> (citation omitted).  The IDEA's implementing regulations provide that a student has been substantively harmed if "the procedural inadequacies (i)[i]mpeded the child's right to a FAPE; (ii) [s]ignificantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) [c]aused a deprivation of the educational benefit."  34 C.F.R. § 300.513(a)(2).

For an agency's failure to provide a substantively adequate IEP, a plaintiff may either seek compensatory relief for appropriate educational services within the district or tuition reimbursement for a suitable placement in a private school.  <u>C.H.</u>, 606 F.3d at 66.  To be entitled to private school tuition reimbursement, parents must establish:  (1) the education agency failed to propose an IEP that constituted an offer of a FAPE, (2) the private school placement was appropriate, and (3) equity requires reimbursement.  <u>Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter</u>, 510 U.S. 7, 12–

16 (1993); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 (1985).

A plaintiff may demand a "due process hearing" to dispute an education agency's compliance with the IDEA before an administrative body, in this case the Pennsylvania Department of Education's Office of Dispute Resolution.  20 U.S.C. § 1415(g); 22 Pa. Code § 14.162.  N.H.'s parents did so here.  The losing party may challenge the resolution of the administrative process in state or federal court.  § 1415(i)(2)(A).  The reviewing court shall receive the administrative record and hear supplemental evidence at the request of a party. § 1415(i)(2)(C).

In reviewing administrative decisions under the IDEA, the court applies a "modified de novo" standard of review. P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).  Key to this inquiry is deference to the educational expertise of the hearing officer.  See, e.g., Montgomery Cnty. Intermediate Unit No. 23 v. K.S. ex rel. K.S., Civ. A. No. 20-2330, 2021 WL 2654144, at *7 (E.D. Pa. June 29, 2021).  Review of questions of law is plenary.  P.P., 585 F.3d at 735.  The court gives "due weight" and deference to the factual findings of the hearing officer in the administrative proceedings.  Id. at 734.  As such, the court treats the factual findings of the hearing officer as "prima facie correct" and

reviews those findings for clear error.  Id. at 734-35.
Although the court may depart from those findings if it fully
explains why by citing to the administrative record, the court
may not "substitut[e] its own notions of sound educational
policy for those of the agency it reviews."  S.H. v.
State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270
(3d Cir. 2003); see also Bd. of Educ. of Hendrick Hudson Central
Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).

## II

The hearing officer found the following facts.  The
court defers to these findings, many of which are undisputed,
and none of which is clearly erroneous.[2]

N.H. is a fifteen-year-old student who has been
diagnosed with two disabilities recognized under the IDEA, OHI
and Autism.  He began attending an elementary school in the
District during the 2015-2016 school year when he was a fourth
grader.  The following school year, N.H. engaged in physically
aggressive behavior such as hitting and kicking adults as well
as throwing objects around the classroom.  His parents informed
the District that N.H. would attend a private school in
Pennsylvania for the 2017-2018 school year.

_____

2.   As neither party has sought to offer additional evidence,
the court's review is limited to the administrative record.

In October 2017, N.H.'s parents briefly considered reenrolling N.H. as a student in the District.  On the advice of a therapist, however, they enrolled him in a private therapeutic boarding school in Idaho for the rest of the school year.  N.H. continued to attend the Idaho boarding school the following 2018-2019 school year.[3]

N.H.'s parents considered reenrolling N.H. in the District for the 2019-2020 school year.  In March 2019, while N.H. was finishing eighth grade at the Idaho boarding school, his parents requested an offer of a FAPE from the District for the upcoming school year.  The District issued a notice to reevaluate N.H. and requested N.H.'s availability for testing in Pennsylvania.  His parents consented to the reevaluation in April but did not respond to the District's request for dates when N.H. would be available for testing.

N.H.'s parents and the District had no contact until June when the District's Director of Specialized Programs & Services called N.H.'s parents and left a voicemail inquiring about N.H.'s availability for testing.  The Director followed up via email in July.  N.H.'s parents eventually responded that N.H. would be returning to Pennsylvania from Idaho at the end of

---

3.    Although the hearing officer analyzed whether plaintiffs were entitled to reimbursement for N.H.'s tuition from the 2018-2019 school year, plaintiffs do not seek tuition reimbursement from this court for that school year.

August and would be available between August 19 and September 3.
Later in July, N.H. visited Pennsylvania for two days en route
to an out-of-state family vacation.  N.H.'s parents did not
inform the District of his possible availability during those
two days.

It was not until July 29 that N.H.'s parents supplied
the District with an educational evaluation of N.H. that a
clinical psychologist prepared earlier in March.  The evaluation
considered N.H.'s scholastic aptitude and achievement as well as
behavioral metrics.  It also relied on reports from N.H., his
parents, as well as his therapist and teachers at the Idaho
boarding school.  It identified areas of need with various
behavioral traits such as executive functioning and social
skills.  It found that N.H. struggled to use his coping skills
in unstructured settings and otherwise had difficulties with
attention, impulse control, and emotional control.  It
recommended placing N.H. in a boarding school with a lower level
of care or a "structured setting with access to therapeutic
supports, predictability, smaller class size, extended time,
regular psychiatric services, physical activity, and ongoing
individual therapy."

On August 1, 2019, N.H.'s parents requested funding
from the District for N.H. to attend a private Rhode Island
boarding school for the 2019-2020 school year.  Although the

school year was set to begin on August 26, the District proposed
to test N.H. on August 27, 28, and 29.  N.H.'s parents signed a
release granting the District access to N.H.'s records from the
Idaho boarding school on August 27.  The next day,
representatives from District met with N.H.'s parents to discuss
additional testing needs.  At that meeting, the District also
described its "interim" IEP for N.H.

        The interim IEP was so termed because the District
developed it "in the interim of reevaluation" based on future
testing.  It relied exclusively on the findings of the
March 2019 private evaluation supplied by N.H.'s parents.  The
District proposed for N.H. "supplemental autistic and gifted
support and services" and set goals for measuring their
effectiveness.  It recommended providing N.H. with, among other
things, a structured classroom and a school aide to provide one-
to-one behavioral and social support.

        In September N.H. left for the Rhode Island Boarding
school where he lived until the school sent its students home at
the outset of the COVID-19 pandemic in March 2020.  Meanwhile
the District continued to test N.H. when he returned to
Pennsylvania, including two days in October 2019, one in
November 2019, and another in January 2020.  On these visits,
the District conducted various assessments of N.H.'s skills in
speech and language as well as his need for occupational therapy

and physical therapy.  The District also sought information from
N.H.'s private schools.  In September 2019, the District
received N.H.'s academic discharge report from the Idaho
boarding school.  In December, the District requested records
from the Rhode Island boarding school.

In March 2020, the District completed its reevaluation
report.  The report relied on the private evaluation, input from
N.H.'s teachers and parents, an interview with N.H., records
from N.H.'s schools in Idaho and Rhode Island, and the
assessments conducted earlier in the school year.  It confirmed
that N.H. had a primary disability of OHI and continued to
qualify as a student with Autism.  It found that N.H. struggles
with attention regulation, executive functioning, and
self-regulation.  It also recommended changes to N.H.'s school
programming to promote his transition to a less restrictive
educational environment.

Later in March 2020, the District presented the
finalized IEP to N.H.'s parents in a meeting with them.  The IEP
aimed to address N.H.'s needs in certain behavioral areas such
as his "perspective-taking" abilities in social settings, his
ability to prevent and cope with anxiety, as well as his
attention regulation and executive functioning.  It offered
goals for him to improve his skills in these areas.  It also

suggested specially designed instruction and modifications to
N.H.'s educational environment, including the following:

> a highly structured classroom, checklists,
> extended time, preferential seating, graphic
> organizers, a 1:1 aide, scheduled breaks,
> direct social skills instruction, gifted
> enrichment activities, personalized lunch
> selection, a transition plan, direct
> executive functioning instruction, movement
> breaks, weekly counseling with a social
> worker, a FBA for PBSP development and
> observation by a BCBA to assess classroom
> functioning.

N.H.'s parents were not satisfied with the District's
plan.  In April 2020 they relayed to the District their
objections, among other things, to the proposed one-to-one aide,
N.H.'s placement in a regular education setting, and the
proposed classroom size.  For those reasons, N.H.'s parents the
following month requested a due process hearing on the draft IEP
and sought tuition reimbursement for the 2019-2020 and 2020-2021
school years.

N.H.'s parents presented their case for reimbursement
before a hearing officer.  Over the course of the four-day
hearing held by videoconference, they called ten witnesses,
including professionals who had evaluated N.H. from the District
and from the Idaho and Rhode Island boarding schools.  One
parent testified at this hearing as well.  The hearing officer
found each witness testified credibly although she explained she

gave more weight to the testimony of certain witnesses than to that of others.

The hearing officer denied plaintiffs all relief.  She found that they were not due reimbursement for the 2019-2020 school year.  In doing so, she concluded that the delay in producing the August 2019 interim IEP did not cause N.H. or his parents substantive harm.  She also determined that the August 2019 interim IEP constituted a proper offer of a FAPE. With respect to the 2020-2021 school year, the hearing officer rejected plaintiffs' procedural and substantive arguments for reimbursement.  She ruled that the ten months it took the District to complete the reevaluation report was not a basis to entitle plaintiffs to compensation.  She also held that the March 2020 IEP was appropriate as it adequately addressed N.H.'s needs with respect to coping skills, social skills, and executive functioning.

III

Plaintiffs first argue that the District is liable for not finalizing N.H.'s IEP before the beginning of the 2019-2020 school year.  The hearing officer acknowledged the interim IEP was not made available until August 28, 2019, two days after the first day of school.  Nonetheless, she found the timing did not cause a denial of a FAPE.  She explained that N.H.'s parents

contributed to the delay and had previously determined to send

N.H. to the Rhode Island boarding school:

> On April 29, 2019, the Parents consented to
> a reevaluation of Student. When issued, the
> PTE indicated that assessments were planned
> that would require the Student's in-person
> availability. Specifically, the District
> planned to administer "psychoeducational
> tests, perceptual-motor, academic and
> social/emotional functioning,
> speech/language, physical therapy and/or
> occupational therapy assessments." However,
> communication lapsed between the parties
> during May and most of June with phone calls
> attempting to move the process forward,
> either unreceived or unacknowledged between
> the parties. On July 16, 2019, the Parents
> advised the District that Student would be
> available for in-person testing at the end
> of August. On July 29, 2019, the Parents
> provided the District with a privately
> obtained psychological assessment of
> Student. Although this evaluation occurred
> months before, the Parents did not share it
> with the District. By August 1, 2019, before
> Student graduated from the Idaho boarding
> school, the Parents had decided that the
> Student would attend a Rhode Island boarding
> school for the 2019-2020 school year. The
> Parents then advised the District that
> Student would be available for testing, in
> person, between August 20, 2019 (after
> graduation from the Idaho school) and
> September 3, 2019 (commencement of school
> year at the Rhode Island boarding school).

To be sure, the IDEA requires an education agency to

have an IEP in effect for each child with a disability in its

jurisdiction "[a]t the beginning of each school year."

§ 1414(d)(2)(A).  However, the failure to provide an IEP before

the first day of school is considered a procedural violation.

C.H., 606 F.3d at 68.  Thus, a school district need only
compensate a plaintiff if the tardiness of the IEP caused the
student or parents substantive harm.  See id. at 68-69.

        Our Court of Appeals addressed in P.P. the effect of
an untimely drafted IEP.  585 F.3d 727.  Even though the school
district delayed evaluating the student for months, an
administrative body denied parents relief because the parents
never intended to send the student to the public school.  The
administrative body and district court found compelling that the
parents had enrolled their child in a private school before the
beginning of the school year.  The Court of Appeals affirmed the
district court's reliance on that finding.  It explained that
the parents were not entitled to relief because "the record
[did] not show that the delay had any impact" on the parents'
decision to keep their child in private school.  Id. at 737-38.

        As noted above, the hearing officer found N.H.'s
parents had already decided to send N.H. to the Rhode Island
boarding school by August 1.  To dispute that finding,
plaintiffs direct the court to the testimony of N.H.'s parent,
who stated that the plan throughout N.H.'s time at the Idaho
boarding school was to send N.H. back to a school in the
District.  Plaintiffs also cite N.H.'s "Individual Service Plan"
at the Idaho boarding school, drafted in 2018, which stated that
N.H. was to return home to Pennsylvania following his discharge.

This evidence all relates to the parents' state of mind prior to August 1, 2019.  The hearing officer did not find this evidence persuasive as to the parents' intent as of August 1, and this court has no basis to reject her finding.  Plaintiffs simply have not identified any basis for any substantive harm from the interim IEP's late release.  Accordingly, the hearing officer properly found the delayed release of the interim IEP did not cause N.H. or his parents substantive harm.[4]

Plaintiffs next argue the hearing officer erred in finding that the interim IEP for the 2019-2020 school year was substantively adequate.  An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 998, 999 (2017).  Whether an IEP is reasonably calculated to do so is a question of fact that this court reviews for clear error.  K.D. ex rel. Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 254 (3d Cir. 2018).  The court must assess the IEP based on the information available

---

4.   Although the hearing officer found the interim IEP was dated August 28, 2019, N.H. claims the interim IEP was first produced on September 13, 2019.  Plaintiffs admit, however, that N.H.'s parents met with the District to discuss the interim IEP on August 28, and they do not cite any new information contained in the interim IEP that was not discussed at this meeting. Thus, even if N.H. had cited evidence showing the hearing officer's finding that the interim IEP was offered on August 28 was clearly erroneous, it does not alter the court's holding.

to the school district "at the time it was made."  D.S. v.

Bayonne Bd. of Educ., 602 F.3d 553, 564-65 (3d Cir. 2010).  In

doing so, the court is mindful that "the question is whether the

IEP is reasonable, not whether the court regards it as ideal."

Endrew F., 137 S. Ct. at 999.

        The hearing officer found the interim IEP offered N.H.

a FAPE.  She highlighted the needs identified in the private

evaluation, including "increased perspective-taking abilities

within social situations, ability to identify antecedent to

anxiety and apply coping strategies, executive functioning

strategies, and application of coping skills."  She then found

the interim IEP adequately addressed those needs:

> Although the private evaluation suggested a
> step down from the Idaho therapeutic setting
> to another boarding school might be
> appropriate, it also provided instructional
> recommendations for incorporation into a
> school setting. The District incorporated
> some of those suggestions into its interim
> offer of FAPE. The interim IEP proposed
> supplemental autistic support and services
> and gifted programming with goals designed
> to address Student's known gifted, executive
> functioning, social skills, and behavior
> needs. Program modifications and specially
> designed instruction (SDI) included a highly
> structured classroom, a checklist with
> expectations, a one-to-one aide to provide
> behavior and social supports throughout the
> school day, and a transition plan for
> adjustment back to a community public school
> setting.

Plaintiffs argue the interim IEP did not sufficiently account for N.H.'s transition from the Idaho boarding school to a placement in the District.  Rather than place N.H. in general education classes, plaintiffs argue the District should have provided him a smaller class setting.  They claim the hearing officer erred in disregarding the testimony to that effect from N.H.'s therapist at the Idaho boarding school, an administrator at the Rhode Island boarding school, and his parent.  They object to the District's proposal for N.H. to leave each class after fifteen minutes to finish his coursework in a special education classroom and the District's designation of a one-to-one aide, which they say would have been "stigmatizing and alienating."  They also contend the interim IEP did not offer enough mental health support because it did not program enough special education time into his schedule.

To begin with, the hearing officer properly evaluated the interim IEP based on the information the District had available at the time.  See D.S., 602 F.3d at 564–65.  Because of the parents' delay in producing N.H. for testing, the District could rely only on N.H.'s March 2019 private evaluation when it drafted the interim IEP.  At the time, the District was not privy to the testimony from the Rhode Island school official that plaintiffs reference in their motion as N.H. had not yet enrolled in that institution.  Likewise, due to the failure of

-16-

N.H.'s parents to communicate with the District, the District received minimal input from them.  Even if the District should have actively sought information from N.H. parents and the Idaho boarding school, the March 2019 private evaluation incorporated reports both from N.H.'s therapist and teachers at the Idaho boarding school as well as his parents.  Thus, the hearing officer did not err in evaluating the effectiveness of the interim IEP based on the needs identified in the private evaluation.

        With this scope in mind, the court finds no clear error in the hearing officer's conclusion that the interim IEP was reasonably calculated to address those needs.  The hearing officer found that N.H.'s needs in perspective-taking, executive functioning, and coping skills were sufficiently addressed with the proposed modifications to the classroom environment and specially designed instruction.  The interim IEP incorporated some of the private evaluation's recommendations for reintroducing N.H. to a general education setting.  Although the interim IEP did not match every recommendation in the private evaluation, such as smaller class sizes, the interim IEP did not overlook any aspect of the evaluation in a way that would render the IEP unable to offer a meaningful education benefit.  Again, the IEP must simply be reasonable and does not need to be ideal. See Endrew F., 137 S. Ct. at 999.

-17-

IV

Plaintiffs also seek reimbursement for N.H.'s ninth grade tuition at the Rhode Island private school for the 2020-2021 school year.  They contend that during this school year, the District committed procedural violations of the IDEA and failed to offer N.H. a substantively adequate IEP.

Plaintiffs first argue they are entitled to tuition reimbursement because the District did not timely complete the reevaluation report and point to the ten-month period between the time when N.H.'s parents consented to the reevaluation on April 29, 2019, and the report's release on March 2, 2020.  This is a longer interval than the sixty days allowed under Pennsylvania law.  See 22 Pa. Code § 14.123(b).

The hearing officer denied plaintiffs compensatory relief over the District's delay in completing the reevaluation report.  She noted that an education agency need not shoulder the burden of evaluating a student placed on the parents' sole initiative in an out-of-state private school.  For that proposition, she relied on Great Valley Sch. Dist. v. Douglas M., 807 A.2d 315, 321-22 (Pa. Commw. Ct. 2002), and H.D. ex rel. Jeffrey D. v. Kennett Consol. Sch. Dist., Civ. A. No. 18-3345, 2019 WL 4935193, at *23-24 (E.D. Pa. Oct. 4, 2019).  Because N.H.'s parents unilaterally enrolled him in an out-of-state school, she held the District could avoid

-18-

liability for the delay so long as the manner in which it
conducted the evaluation was reasonable.  As N.H. lived in
Pennsylvania for only two weeks of the evaluative period--from
August 20 through September 3, 2019--she found the District's
actions in performing tests on days when he returned to
Pennsylvania from Rhode Island to be reasonable:

> The Student attended school in Idaho
> and then Rhode Island for most of the
> evaluative period. This decision effectively
> rendered Student unavailable for the
> performance of necessary assessments needed
> to complete the reevaluation. The parties
> communicated their availability, and except
> for Student's undisclosed return to
> Pennsylvania in July, the Parents did their
> best to comply and made Student available.
> However, the longest period of Student's
> availability was mid-August 2019 until early
> September. This timeframe provided a limited
> window during the summer of 2019 (during
> which the District had no obligation to
> evaluate). The District had no
> responsibility to push Student's evaluation
> to the front of the line during the summer
> when the Parents had already decided to
> place Student in another out of state
> placement. This District did not participate
> in any decisions to place Student in out of
> state boarding schools. The Parents made all
> decisions regarding placement of the
> Student.
>
> After the start of the 2019-2020 school
> year, the same pattern continued. Student
> remained in Rhode Island at a boarding
> school. The parties communicated their
> availability and made Student available on
> select days for continued assessment.

The hearing officer further found that the District's delay in completing the reevaluation report did not cause N.H. or his parents any substantive harm.

Plaintiffs assert that the District should have moved more quickly to obtain certain information for the reevaluation report.  They fault the District for not assigning a school psychologist until the first day of the 2019-2020 school year and not requesting N.H.'s records from the Idaho boarding school until January 2020.  They also argue the school psychologist took an unreasonable amount of time to draft the report once the testing was completed.

The court agrees that the District acted reasonably in evaluating N.H. considering the geographical constraints with which it was encumbered.  Before the District received N.H.'s records from the Idaho boarding school, it had access to information about his progress and current abilities at that school through the March 2019 private evaluation since, as noted above, the evaluation relied on input from N.H.'s teachers and therapists.  Furthermore, save for a couple of weeks in August and September 2019, N.H. was in Idaho and Rhode Island during the evaluative period.  The District cannot be blamed for the decision of N.H.'s parents to place him at schools faraway.  The District was reasonable in coordinating with N.H.'s parents to schedule testing for N.H. once or twice a month on dates when

N.H. could return from his Rhode Island school.  The court also notes, as did the hearing officer, that N.H.'s parents contributed to this delay.  Although N.H.'s parents requested an offer of a FAPE in April 2019, they did not respond to the District's request for N.H.'s availability until July 2019, and when they did, they provided the school with only a two-week window to complete the testing when N.H. was in Pennsylvania. Likewise, N.H.'s parents commissioned a private evaluation of N.H. in March 2019 but did not share it with the District until July 29.  In sum, given the circumstances, the District scheduled testing for N.H. on a reasonable timeline.

Even if the District's evaluative process were unreasonable, the reevaluation report delay would be a procedural violation of the IDEA.  The delay must cause substantive harm to warrant compensatory relief.  See, e.g., P.P., 585 F.3d at 737-38.  As noted above, as early as August 1, 2019, N.H.'s parents were already set on sending him to the Rhode Island boarding school roughly a month before the start of the 2019-2020 school year.  And in March 2020 there was still ample time ahead of the 2020-2021 school year for N.H.'s parents to decide to reenroll him in the District.  The court agrees with the hearing officer that the District's delay in completing the reevaluation report did not result in any substantive harm.

Next, plaintiffs challenge the District's methodology in compiling the reevaluation report.  They claim the District's speech and language therapist did not adequately assess N.H.'s social skills.  The therapist testified that during her evaluation, however, she questioned N.H. to determine if he could "make social inferences based on pictures that he was viewing" and also "read him social scenarios [to] see if he responded appropriately with his pragmatic language skills." Plaintiffs also contend the District's occupational therapist erred by not seeking teacher input from his Rhode Island boarding school.  The therapist testified he solicited input from the Rhode Island boarding school but, when he did not hear back, he concluded the information he gleaned from examining N.H. was sufficient to compile his report.  Because evidence in the record supports the hearing officer's findings that the assessments of both therapists were adequate, plaintiffs have not met their burden of showing those findings to be clearly erroneous.

Plaintiffs finally contend the March 2020 IEP, based on the reevaluation report, did not constitute an offer of a FAPE.  First, they take issue with the March 2020 IEP's monitoring goals.  An IEP must "identify goals for meaningful improvement relating to a student's potential."  Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 563 (E.D. Pa. 2013);

see 20 U.S.C. § 1414(d)(1)(A).  However, an IEP can be
sufficient even if it does not include "specific monitoring
goals for every single recognized need of a disabled student."
Coleman, 983 F. Supp. 2d at 573.  The inquiry, of course, is
whether the omission or imprecision of a monitoring goal renders
the IEP unable to provide a meaningful educational benefit.
See id.

        Plaintiffs argue that the IEP'S coping skills goal
inaccurately responds to anxiety.  Instead, they contend this
goal should address N.H.'s "perspective-taking and regulating
behaviors in response to frustrating circumstances."  They claim
the IEP also fails to address N.H.'s needs in executive
functioning.  The executive functioning goal called for N.H. to
use a day planner, and while this may address his organization
skills, plaintiffs believe it overlooks N.H.'s needs in
"cognitive flexibility, sustaining attention, and inhibitory
control."  Plaintiffs further contend the IEP was deficient for
not including a goal to address N.H.'s self-confidence.

        The hearing officer found that the March 2020 IEP
proposed goals responsive to the needs identified in N.H.'s
reevaluation report.  She endorsed N.H.'s coping skills goal:

> The IEP goals were interrelated and designed
> to teach the Student necessary coping and
> self-regulatory behaviors while
> acknowledging the ongoing struggle with
> anxiety. The proposed coping skills goal was

designed to help Student self-identify
feelings of anxiety and incorporate
introduced strategies to reduce those
feelings. Specifically, the District offered
direct instruction in the areas of self-
regulation and problem-solving. Instruction
would occur three times per six cycle day
during counseling sessions to review coping
strategies and anxiety management. This goal
was based on the results from the
assessments of emotional functioning, the
Parent concerns, and the input received from
the boarding schools Student attended. All
that information was consistent that Student
although academically talented, required an
educational plan with explicit behavioral
expectations.

The hearing officer also found N.H.'s social skills

goals were appropriate:

The RR determined Student had social skills
needs requiring direct instruction,
emphasizing coping skills, perception
taking, and regulating behavioral responses
to frustrating circumstances. Appropriately,
the March IEP proposed two social skills
goals designed to address peer influence and
perspective. Direct instruction focusing on
reciprocal conversation, social cues, and
peer relations supported both goals. The
District proposed these goals in direct
response to Student's identified needs as
outlined in recent parent and teacher input
and corroborative evaluative data. The
Parents' assertion that the executive
functioning goal ignores identified needs is
also unsupported by the evidence. The
completed RR concluded that Student had
challenges with attention regulation and
executive functioning, warranting special
education eligibility as a child with OHI.
The evaluative conclusions recognized that
Student needed direct instruction in
"cognitive flexibility, attention,
inhibitory control and

planning/organization.", precisely what the
IEP proposed. Through this goal, Student
would receive direct instruction focusing on
day planner usage, organization, work
completion, test preparation, task
initiation, and time management.

The record supports the hearing officer's
determination that the IEP was reasonably calculated to enable
N.H. to make educational progress.  At the outset, the court
sees no merit in plaintiffs' attempts to dissect the coping
skills goal in the IEP.  As the hearing officer observes, N.H.'s
struggle with anxiety is "interrelated" with his coping and
self-regulatory behavior.  The exception plaintiffs take to the
District's attempt to address anxiety through these skills is
perplexing considering the hearing officer's finding that N.H.'s
2019 private evaluation and his parent's testimony "extensively
referenced" his history and former diagnosis with anxiety and
its impact on his functioning.  The court likewise notes that
the coping skills goal mentions "direct instruction in
self-regulation."  Although the coping skills goal does not
address N.H.'s perspective-taking skills, the IEP addresses them
in a separate social skills goal.

The record also does not support plaintiffs' claim
that N.H.'s executive functioning goal in the IEP was deficient.
It was not, as they claim, "focuse[d] simply" on teaching
organization by having N.H. use a day planner.  The reevaluation

report named additional areas of need in cognitive flexibility, sustained attention, and inhibitory control.  The hearing officer found that his executive functioning goal responded to all these needs.  The goal involved direct instruction--and not just on his use of a planner but also on his skills in "organization, work completion, test preparation, task initiation, and time management."

It is true that the March 2020 IEP did not contain an express goal to improve N.H.'s self-confidence.  Consistent with the precept that the IDEA requires only a reasonably calculated IEP, the absence of a goal to address N.H.'s self-confidence need is not fatal.  See, e.g., Coleman, 983 F. Supp. 2d at 573.  The court sees no error in the hearing officer's determination that, in the totality of the circumstances, the March 2020 IEP goals were sufficient to meet N.H.'s needs.

Aside from its monitoring goals, plaintiffs maintain the IEP is flawed because the District offered to place N.H. in a regular education class with a one-to-one aide.  They reiterate the presence of the aide in the regular education classroom would have stigmatized N.H.  They believe the only proper placement for him would be in a "small, structured classroom environment."

The hearing officer found that the District's plan to place N.H. in regular education classes with an aide was

reasonably calculated to provide a meaningful educational

benefit.  She credited the District for proposing specially

designed instruction in a "highly structured" environment.  She

noted the District planned for N.H.'s "gradual acclimation to a

larger school environment."  She also considered and rejected

concerns over the potential stigmatization of having the aide in

N.H.'s classroom:

> Under this plan, in the morning, the Student
> with the aide would report to the autistic
> support classroom to review the daily
> schedule. Student would then report to the
> appropriate class for fifteen minutes with
> time increasing consistent with a growing
> comfort level. A [Board Certified Behavioral
> Analyst] was also proposed to conduct a
> classroom observation, collect data, and
> make recommendations about the necessity of
> continued support by the one-to-one aide.
> The proposal of an aide was in direct
> response to concerns about Student's
> potential for anxiety and coping skills
> associated with adjustment to a public
> school. To reduce possible anxiety, the
> District proposed the assignment of two
> different aides to Student. Testimony from
> the District established that as Student
> learned and then implemented the social and
> behavioral skills, a reduction of the aide's
> time would commensurately decrease.

The hearing officer weighed conflicting evidence on

whether the placement in the regular classroom with the

one-to-one aide would be effective.  N.H.'s therapist at the

Idaho boarding school testified that N.H. needed a smaller

classroom because N.H. would become overwhelmed in big group

settings.  Likewise, an administrator from the Rhode Island boarding school said that the presence of an aide in the classroom would damage N.H.'s self-esteem and self-confidence, and N.H.'s parent also testified that N.H. had an aide when he attended an elementary school in the District and that the presence of the aide was stigmatizing.

By contrast, the District's Special Education Teacher testified that the regular education classes the District proposed would have structure and set routines.  She testified that the District trained regular education teachers to provide clear and precise expectations, which she said would help N.H. with his executive functioning skills.  She explained that the District had taken steps to mitigate the possibility of stigma from the presence of the one-to-one aide in the classroom.  The aides, she testified, would facilitate classwork and support the teacher "in a less discrete, less involved kind of way."  To further reduce potential stigma, the District would provide N.H. with two different aides throughout the day.

Plaintiffs essentially argue that the hearing officer erred in weighing the evidence.  The hearing officer was well within her province to credit and give more weight to the testimony offered by the District.  Considering the evidence supporting her decision, plaintiffs have not met their burden to show that the hearing officer committed clear error in finding

that the March 2020 IEP was appropriate.  As noted above, it is not for the court to "substitute its own notions of educational policy for those of local school authorities."  S.H., 336 F.3d at 270.

V

The court agrees with the hearing officer that the District did not deny N.H. a FAPE for the 2019-2020 and 2020-2021 school years.  Thus, the court need not reach the issues of whether N.H.'s placement at private schools was appropriate and whether equitable considerations require reimbursement.

The court will deny the motion of plaintiffs for judgment on the administrative record and will grant the motion of the defendant Phoenixville Area School District for judgment on the administrative record.